UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


TRACY LUMM,

                Plaintiff,                                       Hon. Janet T. Neff

v.                                                    Case No. 1:13-CV-461

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____/

## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim for Supplemental Security Income (SSI) under Title XVI of the Social Security Act.  Section 405(g) limits the Court to a review of the administrative record, and provides that if the Commissioner's decision is supported by substantial evidence, it shall be conclusive.  Pursuant to 28 U.S.C. § 636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of social security appeals, the undersigned recommends that the Commissioner's decision be **reversed and this matter remanded for payment of benefits**.


## STANDARD OF REVIEW

        The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process.  *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988).  The scope of judicial review in a social security

case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial interference. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted). This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision. *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.

## PROCEDURAL POSTURE

Plaintiff initially applied for benefits on December 29, 2005, alleging that she had been disabled since November 19, 1990, due to renal failure, diabetes, ADD, and depression. (Tr. 52-53, 99). Plaintiff's application was denied, after which time she requested a hearing before an Administrative Law Judge (ALJ). (Tr. 27-51). On June 12, 2008, Plaintiff appeared before ALJ James Prothro, with testimony being offered by Plaintiff, Plaintiff's father, and a vocational expert. (Tr. 625-69). In a written decision dated November 10, 2008, the ALJ determined that Plaintiff was not disabled. (Tr. 20-26). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 5-12). Plaintiff subsequently appealed the matter to this Court.

On October 1, 2010, the undersigned recommended that the Commissioner's decision be reversed and this matter remanded for further factual findings pursuant to sentence four of 42 U.S.C. § 405(g). *Lumm v. Commissioner of Social Security*, Case No. 1:09-cv-756 (W.D. Mich.). The Honorable Janet T. Neff subsequently adopted this recommendation and entered judgment against Defendant. On November 7, 2011, ALJ Prothro conducted a second administrative hearing at which Plaintiff, Plaintiff's parents, and a vocational expert testified. (Tr. 1459-1500). In a decision dated December 12, 2011, the ALJ again concluded that Plaintiff was not disabled. (Tr. 685-96). The Appeals Council declined to review the ALJ's decision rendering it the Commissioner's final decision in this matter. (Tr. 670-73). Plaintiff initiated the present appeal seeking judicial review of the Commissioner's decision.

## RELEVANT MEDICAL HISTORY

Plaintiff was born on August 26, 1986.  (Tr. 52).  She suffered kidney failure as a young child and received a donor kidney in 1991.  (Tr. 158, 175-78).  Plaintiff subsequently experienced "recurrent acute rejection" and "chronic rejection" of the donor kidney and was compelled to resume "chronic dialysis" in July 2003 as she was suffering "end-stage renal failure." (Tr. 158, 175-78, 227-28).  During this time, Plaintiff suffered "a splenic infarct and she was left, after prolonged hospitalization, with exogenous, as well as endogenous deficiency of pancreatic function."  (Tr. 236).  Plaintiff underwent a second kidney transplant on December 1, 2003.  (Tr. 175-77, 469, 560-68).

On January 19, 2004, Plaintiff was examined by Dr. Daniel Legault.  (Tr. 163-64). Plaintiff reported that she was not experiencing fever, lethargy, or difficulty with urination.  (Tr. 163).  Plaintiff also reported that she recently returned to school.  (Tr. 163).  The results of an examination were unremarkable.  (Tr. 163).  The doctor indicated that Plaintiff "will be continued on triple immunosuppressant medications indefinitely, due to this being her second transplant and the multiple complications suffered with [the] first."  (Tr. 163).  Dr. Legault also observed that Plaintiff suffered from hypertension, thrombocytosis, and type I diabetes.  (Tr. 163-64).

Treatment notes dated March 25, 2004, indicate that Plaintiff "has resumed presumably normal kidney function."  (Tr. 373).  Treatment notes dated June 11, 2004, indicate that Plaintiff "has generally felt well."  (Tr. 158).  She denied experiencing fevers, chills, dysuria, hematuria, allograft discomfort, nausea, vomiting, dyspepsia, or abdominal pain. (Tr. 158).  Plaintiff reported that her "appetite is intact" and that "her blood sugars have been under reasonable control." (Tr. 158).  On June 17, 2004, Plaintiff reported that "she takes many medications related to diabetes

4

and her transplant medication, but realizes the importance of medication and is able to keep it in perspective and cope with it fairly well." (Tr. 370). Plaintiff's mother reported that she "has no concerns." (Tr. 370). On June 30, 2004, Plaintiff underwent surgery to treat a right brachiocephalic aneurysm.[1] (Tr. 317).

On November 11, 2004, Plaintiff reported that "she is feeling much better" since receiving her second kidney transplant. (Tr. 360). Treatment notes dated June 10, 2005, indicate that Plaintiff "reports no significant complications with regards to her transplant." (Tr. 183). During a June 16, 2005 examination, Plaintiff reported that "the second transplant has been very successful." (Tr. 345). Plaintiff denied experiencing depression and indicated that "she is typically in a good mood." (Tr. 345). Plaintiff also reported that "this past year she took one semester of school at KVCC in the fall." (Tr. 345). On July 29, 2005, Plaintiff reported that the Ritalin and Zoloft she was taking were "working well." (Tr. 242).

Treatment notes dated September 16, 2005, indicate that Plaintiff experiences "a severe immune deficiency" due to her kidney transplant. (Tr. 200). On October 10, 2005, Plaintiff underwent a bilateral myringotomy[2] treat her chronic tubotympanitis. (Tr. 207-10). On February 17, 2006, Dr. Legault characterized Plaintiff's condition, vis-a-vis her kidney transplant, as "clinically stable." (Tr. 307).

On May 3, 2006, Plaintiff participated in a consultive examination conducted by George Starrett, Ed.D. (Tr. 266-69). Plaintiff reported that she experiences ADHD and depression.

---

[1]  The brachiocephalic artery supplies blood to the right arm and head. *See* Brachiocephalic Artery, available at http://dictionary.reference.com/browse/brachiocephalic+artery (last visited on September 18, 2014).

[2]  A myringotomy is a surgical procedure in which a small incision is made in the eardrum and a tube inserted to provide ventilation. *See* Myringotomy, available at http://www.medicinenet.com/ear_tubes/article.htm (last visited on September 18, 2014).

(Tr. 266).  Plaintiff reported that "her depressive symptoms have improved with medication, but that she continues to have periods of a depressed mood."  (Tr. 266).  Plaintiff's father reported that "when [Plaintiff] does not take her medications that she is 'bouncing off the walls, and she is not pleasant to get along with.'"  (Tr. 266).  He reported, however, that Plaintiff's mood was "much more stable" with medication.  (Tr. 266).

Plaintiff reported that she was employed part-time as a waitress (working from 11 a.m. until either 3 p.m. or 5 p.m.).  (Tr. 267).  Plaintiff reported that she performs various household chores such as vacuuming, dusting, cleaning her room, and washing dishes.  (Tr. 267).  Plaintiff reported that she "functions independently with regard to checking her insulin levels and takes her own medications."  (Tr. 267).  The results of a mental status examination were unremarkable.  (Tr. 267-68).  Plaintiff was diagnosed with mood disorder and ADHD.  (Tr. 269).  Her GAF score was rated as 75.[3]  (Tr. 269).

On August 7, 2006, Plaintiff was examined by Dr. Legault.  (Tr. 471).  Plaintiff reported that she "feels quite well" and "has no new complaints."  (Tr. 471).  The results of an examination were unremarkable.  (Tr. 471).  The doctor reported that Plaintiff was experiencing "excellent renal function" and "appears stable."  (Tr. 471).  The doctor also reported that Plaintiff's hypertension was "well controlled" and her diabetes was under "fair" control.  (Tr. 471).  Treatment notes dated August 9, 2006, indicate that Plaintiff "is exercising more."  (Tr. 443).  Treatment notes

---

[3]  The Global Assessment of Functioning (GAF) score refers to the clinician's judgment of the individual's overall level of functioning.  American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 30 (4th ed. 1994) (hereinafter DSM-IV).  A score of 75 indicates that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning."  *Id.* at 34.

dated February 9, 2007, indicate that Plaintiff required "replenishment of her pancreatic enzymes" because "her pancreas has essentially disappeared from the CT scan." (Tr. 431).

On March 6, 2007, Plaintiff was examined by Dr. Legault. (Tr. 469-70). Plaintiff reported that she "continues to have no difficulties in relation to her renal transplant." (Tr. 469). Plaintiff also reported that she was presently working as a housekeeper at a local hotel, but that such was "somewhat tiring." (Tr. 469). The results of an examination were unremarkable. (Tr. 469). Dr. Legault reported that Plaintiff was experiencing "excellent renal function on triple immunosuppression." (Tr. 469). The doctor reported that Plaintiff's hypertension was "well controlled." (Tr. 469). With respect to Plaintiff's diabetes, the doctor observed that Plaintiff "is quite fanciful about her glycemic control, she states that her blood sugars are usually less than 180, although I am skeptical on her frequency of glycemic measurement. Her diet is less than desirable, and [she] frequently utilizes fast food alternatives." (Tr. 470).

On June 4, 2007, Plaintiff reported that she "has been doing well" and was attending school. (Tr. 465). Plaintiff indicated that she experiences "occasional diarrhea" if she forgets to take her pancreatic enzyme supplement. (Tr. 465). Treatment notes dated July 17, 2007, indicate that Plaintiff "exercises about three days a week for about 15 minutes." (Tr. 425). Plaintiff reported that she "is taking college classes." (Tr. 425). She indicated that "her concentration is okay, and her grades are doing reasonably well, but she does have concerns about her moods." (Tr. 425). The results of an examination were unremarkable. (Tr. 425).

On October 1, 2007, Plaintiff was examined by Dr. Legault. (Tr. 463-64). Plaintiff reported that her blood sugar levels were "improved." (Tr. 463). Plaintiff reported that she was not experiencing pain or any symptoms consistent with urinary tract infections. (Tr. 463). Plaintiff also

reported that she continued to attend college.  (Tr. 463).  Dr. Legault reported that Plaintiff's "renal function remains stable" with "no escalation of her serum creatinine."  (Tr. 463).  The doctor reported that Plaintiff's hypertension was "well-controlled" with a "minimal dose" of medication. (Tr. 463).  The doctor also reported that Plaintiff had experienced a "marked improvement" in her blood sugars.  (Tr. 464).

On March 31, 2008, Plaintiff was examined by Dr. J. M. Millermaier.  (Tr. 499). With respect to her ADD, Plaintiff reported that she was "doing quite well" with her current medical regimen.  (Tr. 499).  Plaintiff reported that she was working and taking a single college course.  (Tr. 499).  The results of an examination were unremarkable.  (Tr. 499).  The doctor noted that Plaintiff's diabetes was "well controlled."  (Tr. 499).  The doctor also reported that Plaintiff's dysthymia was "managed well" with medication.  (Tr. 499).  Dr. Millermaier reported that Plaintiff was presently experiencing "normal renal function."  (Tr. 499).  With respect to Plaintiff's "pancreatic insufficency/failure," the doctor indicated that Plaintiff would continue her current medication regimen.  (Tr. 499).  On June 13, 2008, Dr. Millermaier reported that Plaintiff is "unable to work more than 4 hours /day due to multiple medical problems."  (Tr. 461).

At the first administrative hearing, Plaintiff testified that she was presently working 25 hours weekly as a prep cook at the Radisson.  (Tr. 634).  She indicated that she "switched out" of the housekeeping department because it was "really hard on [her] back."  (Tr. 634).  Plaintiff indicated that her previous jobs were also part-time in nature.  (Tr. 634-35).  Plaintiff testified that she was unable in the past to maintain a full-time work schedule.  (Tr. 661-62).  Plaintiff testified that she exercises by riding her bike and walking.  (Tr. 641-42).  Plaintiff indicated that she goes

shopping and to movies with her friends.  (Tr. 642-43).  Plaintiff testified that she previously attended college on a part-time basis, but was not presently taking any classes.  (Tr. 632).

Plaintiff testified that because of her general state of health she is forced to be absent from work approximately one day each month.  (Tr. 647).  Plaintiff testified that sometimes she was absent to attend doctor appointments, but that on other occasions she "had to call in because [she has] been really, really tired."  (Tr. 647).  She indicated that her current work supervisors "make allowances and tolerate [her] schedule issues."  (Tr. 647).  Plaintiff also testified that she has to check her blood sugar 7-9 times daily and has to inject herself with insulin "probably ten times a day."  (Tr. 648).  Plaintiff reported that she was unable to lift "much" and could not walk "long distances."  (Tr. 649).

Treatment notes dated January 7, 2009, indicate that "overall, [Plaintiff] is doing quite well."  (Tr. 1374).  Treatment notes dated March 18, 2009, indicate that Plaintiff's diabetes was "well controlled" with her current treatment regimen.  (Tr. 1188).

On October 3, 2009, Plaintiff participated in a consultive examination conducted by Licensed Psychologist Robert Griffith, Ph.D.   (Tr. 1139-44).  Plaintiff reported that she was experiencing "multiple medical difficulties," but "has no medical provider and no medical insurance at this time."  (Tr. 1139).  Plaintiff also "stated that she has anxiety and worries about further health complications."  (Tr. 1139).  With respect to her anxiety, Plaintiff reported that her current medication has enabled her to remain "level headed."  (Tr. 1139).  Plaintiff reported that until "about a month ago," she was "working about 15 to 20 hours a week."  (Tr. 1141).  The results of a mental status examination were unremarkable. (Tr. 1142-43).  Plaintiff was diagnosed with attention deficit

hyperactivity disorder and anxiety disorder. (Tr. 1144). Her GAF score was rated as 58.[4] (Tr.

1144). Dr. Griffith characterized Plaintiff's prognosis as "guarded" and further noted:

> Ms. Lumm has a very significant medical history, which appears to
> be well-documented. She is able to follow simple instructions, but
> has had moderate to marked cognitive struggles with ADHD and
> anxiety, both of which will have an impact on her general ability to
> sustain full-time work.

(Tr. 1144).

A surgical pathology report, dated December 1, 2009, indicated that Plaintiff was

experiencing "post transplant lymphoproliferative disorder."[5] (Tr. 1171). Treatment notes dated

December 7, 2009, reveal that Plaintiff also "tested positive for Epstein-Barr virus" (EBV). (Tr.

1180).

On December 4, 2009, Plaintiff was examined by Dr. Mark Boelkins. (Tr. 1263-65).

With respect to Plaintiff's condition, the doctor reported the following:

> Tracy reports that she otherwise has been feeling relatively well over
> the past few months. She has not experienced fevers, chills, anorexia,
> weight loss, and GI upset. She denies hoarse voice, dysphagia,
> odynophagia, shortness of breath or cough. She denies nausea,
> vomiting, dyspepsia, abdominal pain, or bothersome diarrhea. She
> denies irritative or obstructive voiding complaints. She states that her
> diabetes has been generally well controlled. She checks her
> Glucoscans 4-5 times per day, and her most recent hemoglobin A1c
> last month was 6.6%. She does experience some left knee pain, for
> which she has been taking glucosamine with subjective benefit. Now

---

[4] A GAF score of 58 indicates "moderate symptoms or moderate difficulty in social, occupational, or school functioning." DSM-IV at 34.

[5] Post-transplant lymphoproliferative disorder (PTLD) is "among the most serious complications of long-term immunosuppression for people who have organ transplants." *See* Post-transplant lymphoproliferative disorder, available at http://www.cancer.ca/en/cancer-information/cancer-type/non-hodgkin-lymphoma/pathology-and-staging/types-of-nhl/post-transplant-lymphoproliferative-disorder/?region=on (last visited on September 18, 2014). One of the "most common cancers in people who receive organ transplants," PTLD "behaves like an aggressive lymphoma." PTLD "is almost always related to a virus that has been linked to lymphoma, the Epstein-Barr virus." *Id.*

that she is 23 years of age, she is no longer being covered by her parent's health insurance. She had been working at the Radisson in Kalamazoo, but she was laid off because she was unable to carry things up and down stairs because of her knee discomfort. She currently has limited medical insurance coverage to a county health plan. She has applied for social security disability and Medicaid.

(Tr. 1264).

Following his examination, Dr. Boelkins concluded as follows:

Ms. Lumm is now 6 years' posttransplant. She displays excellent renal allograft function, as evidenced by her well preserved glomerular filtration rate, normal urinary protein excretion, and absence of anemia. Her blood pressure is well controlled without requirement for antihypertensive medication. Her mean glycemic control also appears very acceptable, and she remains free of hyperlipidemia.

Miss Lumm has now been diagnosed with bilateral symmetrical nasopharyngeal soft tissue hyperplasia with associated cervical lymphadenopathy, with nasopharyngeal biopsy demonstrating polymorphic lymphoproliferative disorder, which is likely a consequence of her chronic immunosuppression. Fortunately, this does not appear to be accompanied by any significant systemic constitutional symptoms but would still be considered a premalignant condition, for which evaluation and followup with a hematologist/oncologist would appear clinically appropriate.

(Tr. 1264).

On January 25, 2010, Plaintiff was examined by Dr. Brett Brinker. (Tr. 1268-72).

Following an examination, the doctor concluded as follows:

Tracy Lumm is a pleasant 23-year-old woman with a history of renal allograft who presents with postpharyngeal adenopathy. She is asymptomatic and doing well. A biopsy reviewed by the University of Michigan on November of 2009 was consistent with a polymorphic posttransplant lymphoproliferative disease. This EBV mediated lymphoproliferative disorder is seen generally in the immunosuppressed patient. Given its polymorphic nature and the fact that she is asymptomatic at this time, I recommended observation

11

now that she has had a reduction in her immune suppressive therapy. I do not think chemotherapy is indicated; however, close observation is prudent.  I do not think an additional opinion at the University of Michigan is necessary and we would be happy to follow her here at the Lacks Cancer Center.  I would like to start with a basic CT scan of the chest, abdomen and pelvis at this time.  She does have some insurance issues so we may need to hold off on the PET scan at this time, which is reasonable provided there is no extensive adenopathy noted on her CT scans.  We will have her meet with our resource coordinators for assistance with her insurance coordination.  I reviewed in depth the concept of an EBV-related post-transplant lymphoproliferative disorder and novel therapies such as rituximab chemotherapy and even the adoptive immunotherapy performed at centers such as the National Institutes of Health.  At this time though, reduction in immune suppression and observation is a very appropriate approach to her care.

(Tr. 1271-72).

Following a February 1, 2010 examination, Dr. Boelkins reported the following:

Ms. Lumm is now 6 years posttransplant.  She continues to display excellent renal allograft function.  Her blood pressure today is borderline elevated and this warrants observation.  She remains free of anemia.  She has Epstein-Barr virus positive post-transplant lymphoproliferative disorder which appears to be responding favorably to a reduction in her immunisuppressive regimen, as evidenced by the decline in her detectable serum viral load and continued asymptomatic status.

(Tr. 1266-67).

On February 3, 2010, Plaintiff participated in a CT examination of her abdomen and pelvis the results of which revealed an "atrophic pancreas with numerous calcifications consistent with chronic pancreatitis."  (Tr. 1289-90).  A CT examination of Plaintiff's neck, performed the same day, revealed "enlarged level I lymph nodes bilaterally."  (Tr. 1291).  Treatment notes dated October 29, 2010, indicate that Plaintiff's "sugars have been under good control" and "her ADD has been stable" on her current medication.  (Tr. 1352).

12

At the second administrative hearing, Plaintiff testified that she attended college for two years, but only earned seven credit hours because she could only take one class at a time. (Tr. 1465). Plaintiff reported that until 2009, she worked part time "about 20" hours weekly. (Tr. 1466-68). Plaintiff stated that she had "never worked 40 hours" in a week or ever worked an amount approaching 40 hours weekly. (Tr. 1469). Plaintiff reported that she lived in an apartment and performed minimal household chores "about three days a week." (Tr. 1472). Plaintiff reported that when she was working part time she was not performing very well and was often counseled or disciplined. (Tr. 1476). With respect to her diabetes, Plaintiff testified that she has to test her sugar levels eight to 10 times daily and has to inject herself with insulin eight to 10 times daily. (Tr. 1478). Plaintiff testified that she attends doctor appointments "about once or twice a month if everything is going okay," but more often if she gets sick or has to have lab work completed. (Tr. 1479). With respect to the side effects of her medications, the following exchange occurred between Plaintiff and her attorney:

> Q    Can you tell me what side effects that you're aware of in your own experience, in your own body that comes from those medications?
>
> A    Well first that, that lymphomic disorder. And it irritates my stomach, goes, the pills irritate my stomach sometimes. And it makes me, I get, they suppress my immune system so I get sick very easily and when I do get sick, I remain sick for a long time.
>
> Q    And when you're sick, what does that mean?
>
> A    I'm usually I'm in bed and getting labs a lot - -
>
> Q    I mean, do you have bellyaches, headaches, runny nose?
>
> A    Running nose - -

13

Q       What, what is - -

A       Sore throat.

Q       - - what is that sickness?

A       My ears and my tubes in my ears a lot time like tubes will fall
        out with all that sinus pressure then I'll go, have to go to my
        ear doctor and get it put back in.

Q       When is the last time that that happened?

A       I think that was actually about, maybe two years ago.

(Tr. 1480-81).

With respect to whether she could maintain full time employment, the following

exchange occurred between Plaintiff and her attorney:

Q       Okay.  All right.  With the medical issues that you have and
        the symptoms that you still experience from the insulin
        dependency, the kidney transplants, the, well these, these
        medical problems, do you believe that you could work a full
        time job if you had to report for work and put in eight hours
        a day, five days a week?

A       No.

Q       Can you tell the Judge why you could not do that?

A       Because, there, I always have to take insulin and then it takes
        me a while to get my, you know, my brain back working from
        a blood sugar high or low.  If my blood sugar goes low, I'll
        have to go eat something, even if I'm in the middle of
        something that could be important, I'd have to go get
        something to eat or else I could pass out.  And, or if my blood
        sugar's high I have to get some water in my system or else it
        could really damage my kidneys.  And then my digestive
        problems because my (INAUDIBLE) work at all, so my
        digestive problems if, will sometimes, you know, without any,
        without any, I won't see it coming and my stomach, I'll get

14

like stomachaches and sometimes get diarrhea and I'll have to go to the bathroom a couple of times in a work, in a work day.

Q       And the injections during a normal eight hour work day of your insulin, how many times would you have to do that?

A       Probably about six times.

Q       Because in a typical day, when you're awake, how many times do you take insulin?

A       About eight.

Q       Okay.  If you had an opportunity to work in a very simple easy sit down position where you didn't have to deal with many members of the public, some, something that didn't take a lot of time to learn how to do, but you just would have to be there eight hours a day, five days a week, but only have a break in the morning for 15 minutes, half hour for lunch, and 15 minutes in the afternoon, could you do that?

A       Probably not because, well I could have diarrhea at any given point in time and then I'd have to go to the bathroom, I wouldn't be able to do what I'm supposed to be doing because I'd have to go to the bathroom and maybe more than once and I don't know know how long I'd be in the bathroom for.  And when my blood sugar goes low I'd have to go take care of that and it would take time for me to take care of that, either get some food or take insulin or, then I'd have to test my sugar and I'd have to, and then I'd have to give it time for whatever to kick in, insulin or food.

Q       Would you be able to make a schedule where you would get up in the morning and get to work eight hours a day, five days a week on a regular basis without calling in sick?

A       No, probably not because I have problems sleeping and waking up, because then I have problems going to bed, I wake up in the middle of the night and it really makes it really hard to get up in the morning.

Q       Would you miss more than two days a month in a work schedule because of trouble getting up in the morning?

15

A       Yes.

(Tr. 1481-83).

Plaintiff reported that she can walk "about a block," stand "about an hour," and lift 10 pounds.  (Tr. 1483-85).  Plaintiff reported that if she stands for longer than an hour, she will "sometimes" experience light headedness and back and leg pain.  (Tr. 1485-86).  Plaintiff reported that she can sit for "about an hour" before her back "gets sore."  (Tr. 1486).  Plaintiff further testified that she would be unable to work a full time job because she has "a really hard time focusing on things for very long."  (Tr. 1486-87).

## ANALYSIS OF THE ALJ'S DECISION

The social security regulations articulate a five-step sequential process for evaluating disability.  *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[6]  If the Commissioner can make a dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional

---

[6] 1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2.   An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4.   If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5.   If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. 404.1520(f)).

16

impairment as well as an exertional impairment, both are considered in determining his residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and she can satisfy her burden by demonstrating that her impairments are so severe that she is unable to perform her previous work, and cannot, considering her age, education, and work experience, perform any other substantial gainful employment existing in significant numbers in the national economy.  *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.  While the burden of proof shifts to the Commissioner at step five of the sequential evaluation process, Plaintiff bears the burden of proof through step four of the procedure, the point at which her residual functioning capacity (RFC) is determined.  *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

The ALJ determined that Plaintiff suffers from: (1) history of kidney transplants and end-stage renal disease; (2) type-I diabetes mellitus; (3) attention deficit hyperactivity disorder (ADHD); (4) mild depression; and (5) lymphoproliferative disease, severe impairments that whether considered alone or in combination with other impairments, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 691-92).

The ALJ next determined that Plaintiff retained the capacity to perform light work subject to the following limitations: (1) she can lift 20 pounds occasionally and 10 pounds frequently; (2) in an 8-hour workday with normal breaks, she can sit for 6 hours and stand/walk for two hours; (3) she requires an at will sit/stand option; (4) she cannot climb ladders, ropes, or

17

scaffolds; (5) she can occasionally balance, stoop, kneel, crouch, crawl ,and climb ramps/stairs; (6) she must avoid exposure to fumes, odors, dusts, gases, poorly ventilated areas, and temperature extremes; and (7) she is limited to simple, routine tasks.  (Tr. 692).

The ALJ determined that Plaintiff had no past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that a significant number of jobs exist in the national economy which Plaintiff could perform, her limitations notwithstanding.  *See Richardson*, 735 F.2d at 964.  While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden.  *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added).  This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy.  *See Richardson*, 735 F.2d at 964.  Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding.

The vocational expert testified that there existed approximately 7,500 jobs in the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding.  (Tr. 1497-98).  This represents a significant number of jobs.  *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988); *Martin v. Commissioner of Social Security*, 170 Fed. Appx. 369, 374 (6th Cir., Mar. 1, 2006).  The ALJ concluded, therefore, that Plaintiff was not entitled to disability benefits.

I.   **The Conclusion that Plaintiff does not meet the Requirements of a Listed Impairment is Not Supported by Substantial Evidence**

   The Listing of Impairments, detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1, identifies various impairments which, if present to the severity detailed therein, result in a finding that the claimant is disabled.  Plaintiff asserts that her condition satisfies Section 6.02B of the Listing.  Plaintiff bears the burden of establishing that she satisfies a Listed impairment.  *See, e.g., Bingaman v. Commissioner of Social Security*, 186 Fed. Appx. 642, 645 (6th Cir., June 29, 2006).

   Section 6.02B of the Listing provides as follows:

   Impairment of renal function, due to any chronic renal disease that has lasted or can be expected to last for a continuous period of at least 12 months. With:

   B.  Kidney transplantation. Consider under a disability for 12 months following surgery; thereafter, evaluate the residual impairment (see 6.00E2).

   Section 6.00E2 provides as follows:

   Kidney transplantation (6.02B).   If you have undergone kidney transplantation, we will consider you to be disabled for 12 months following the surgery because, during the first year, there is a greater likelihood of rejection of the organ and recurrent infection.  After the first year posttransplantation, we will base our continuing disability evaluation on your residual impairment(s).  We will include absence of symptoms, signs, and laboratory findings indicative of kidney dysfunction in our consideration of whether medical improvement (as defined in §§404.1579(b)(1) and (c)(1), 404.1594(b)(1) and (c)(1), 416.994(b)(1)(i) and (b)(2)(i), or 416.994a, as appropriate) has occurred.  We will consider the:

   a.  Occurrence of rejection episodes.
   b.  Side effects of immunosuppressants, including corticosteroids.
   c.  Frequency of any renal infections.
   d.  Presence of systemic complications such as other infections, neuropathy, or deterioration of other organ systems.

First, to prevail in a claim for SSI benefits Plaintiff must establish that she was disabled "on or after her application date." *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1233 (6th Cir. 1993) ("[t]he proper inquiry in an application for SSI benefits is whether the plaintiff was disabled on or after her application date").  Plaintiff submitted her application for SSI benefits on December 29, 2005, more than two years after her second kidney transplant.  Thus, Plaintiff does not qualify for the 12 month period of presumptive disability.  The ALJ determined that Plaintiff did not satisfy the Listing because "she has had good renal function at all times pertinent to this decision." (Tr. 691).  While this is a generally accurate statement, it reflects, in the Court's estimation, a flawed reading of the relevant provision.

As previously noted, when assessing whether a claimant satisfies Listing 6.02 "[a]fter the first year posttransplantation," such is based upon the claimant's "residual impairment(s)."  This language suggests that the assessment is not solely concerned with the claimant's "renal function," but is instead concerned with whether the claimant's overall condition has improved or deteriorated post-transplantation.  While renal function is certainly an appropriate part of this assessment, as the regulation quoted above makes clear, however, this assessment also must consider additional factors such as: (1) occurrence of rejection episodes; (2) side effects of immunosuppressants; (3) frequency of renal infections; and (4) presence of systemic complications such as other infections, neuropathy, or deterioration of other organ systems.  Accordingly, in the Court's estimation the question is not simply whether Plaintiff's renal function improved to a particular level, but instead whether Plaintiff's overall health vis-a-vis her kidney impairment improved such that the presumption of disability, applicable immediately following a kidney transplant, no longer applies. *See, e.g., Zirlott v. Astrue*, 2011 WL 4500279 at *8 (N.D. Fla., Aug. 29, 2011) (recognizing that following the 12

20

month period post-transplantation, the relevant assessment must focus on the extent to which the claimant experienced "medical improvement").

As discussed above, Plaintiff has experienced serious side effects from the immunosuppressant medications she is required to take. Aside from the more traditional physical side effects that Plaintiff reported, Plaintiff was diagnosed with post transplant lymphoproliferative disorder, a form of cancer precipitated by her immunosuppressant medication. Plaintiff was also diagnosed with the Epstein-Barr virus. Plaintiff has also experienced "systemic complications" including chronic pancreatitis and diabetes.

In sum, while Plaintiff's renal functioning may be at an acceptable level, such appears to have come at the cost of her overall health which has continued to deteriorate. The Court concludes that the ALJ, by considering only the status of Plaintiff's renal functioning, failed to properly assess Plaintiff's claim under Listing 6.02. When all the relevant evidence is considered, the Court concludes that the ALJ's conclusion is not supported by substantial evidence. The Court further concludes that Plaintiff has satisfied her burden of establishing that she satisfies the requirements of this particular Listing.


**II.      The ALJ's Credibility Assessment is not Supported by Substantial Evidence**

As described above, Plaintiff testified at the administrative hearing that she was impaired to an extent well beyond that recognized by the ALJ. The ALJ, however, discounted Plaintiff's allegations on the ground that Plaintiff was "not found to be fully credible." Plaintiff asserts that the ALJ's credibility assessment is not supported by substantial evidence.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added); *see also*, *Grecol v. Halter*, 46 Fed. Appx. 773, 775 (6th Cir., Aug. 29, 2002) (same).   As the relevant Social Security regulations make clear, however, a claimant's "statements about [his] pain or other symptoms will not alone establish that [he is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)) *Hash v. Commissioner of Social Security*, 309 Fed. Appx. 981, 989 (6th Cir., Feb. 10, 2009).  Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition.  If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531 (citations omitted).  This standard is often referred to as the *Duncan* standard.  *See Workman v. Commissioner of Social Security*, 105 Fed. Appx. 794, 801 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).  However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to

resolve the significant conflicts in the administrative record." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Workman*, 105 Fed. Appx. at 801 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony"). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. The ALJ found Plaintiff's subjective allegations to not be fully credible, a finding that should not be lightly disregarded. *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987). In fact, as the Sixth Circuit recently stated, "[w]e have held that an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Commissioner of Social Security*, - - - Fed. Appx. - - -, 2013 WL 5496007 at *3 (6th Cir., Oct. 4, 2013) (citation omitted).

Nevertheless, "blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence." *Minor v. Commissioner of Social Security*, 2013 WL 264348 at *16 (6th Cir., Jan. 24, 2013). Furthermore, the ALJ must "consider all objective medical evidence in the record, including medical signs and laboratory findings, where such evidence is produced by acceptable medical sources." *Id.*

In discounting Plaintiff's subjective allegations, the ALJ concluded as follows:

> The claimant's allegations of disabling impairments are not found to
> be fully credible. She is socially active and gets along well with her
> family and others. She does household chores including vacuuming,

23

> dusting, cleaning her room and later her apartment, and doing the dishes. She is able to cook and do laundry. She can manage her own finances. She functions independently with regard to checking her insulin levels and takes her medications without reminders. She has a valid driver's license. The claimant graduated from high school in 2004 and worked some part-time jobs as well as attending college. The claimant acknowledges she failed some of her college classes, which she attributes to the ADD and the stress of hospital issues. She watches her diet and exercises by weight-lifting and swimming. She remains active, rides her bicycle, and sometimes walks.

(Tr. 694).

While the ALJ's observations are reasonably accurate, such are not inconsistent with Plaintiff's testimony or her allegation that she simply cannot perform work activities on a full-time or prolonged basis. *See Leos v. Comm'r of Soc. Sec.*, 1996 WL 659463 at *2 (6th Cir. 1996) (the fact that a claimant performed limited nonstrenuous activities does not preclude a finding that she experiences pain to a disabling degree); *Wright v. Sullivan*, 900 F.2d 675, 682 (3d Cir. 1990) ("sporadic or transitory activity does not disprove disability"); *Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989) (to be found unable to engage in substantial gainful activity the claimant need not "vegetate in a dark room" or be a "total basket case").

Plaintiff has not alleged that she is an invalid, suffers from debilitating social phobias, or lacks the ability to generally care for herself. Instead, Plaintiff alleges that her chronic and long-standing medical impairments prevent her from performing work activities on a full-time or sustained basis. This is well-supported by the medical evidence, as well as Plaintiff's testimony and reported activities. The ALJ has failed to identify any doctor or care provider who has articulated a contrary opinion. The ALJ has likewise failed to identify anything in the record that contradicts Plaintiff's subjective allegations or which reasonably calls into doubt the veracity of her testimony

and allegations.  In sum, the ALJ's decision to discount Plaintiff's credibility is not supported by substantial evidence.

**III.       The ALJ Failed to Properly Evaluate the Opinion Evidence**

As previously noted, Dr. Millermaier concluded that Plaintiff is "unable to work more than 4 hours/day due to multiple medical problems."  The ALJ afforded "little weight" to this opinion.  Plaintiff argues that the ALJ failed to provide sufficient rationale for discounting the opinions of her treating physician.

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition.  *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  An ALJ must, therefore, give controlling weight to the opinion of a treating source if: (1) the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) the opinion "is not inconsistent with the other substantial evidence in the case record."  *Gayheart v. Commissioner of Social Security*, 710 F.3d 365, 375-76 (6th Cir. 2013) (quoting 20 C.F.R. § 404.1527).

Such deference is appropriate, however, only where the particular opinion "is based upon sufficient medical data."  *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)).  The ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence.  *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991

WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

If an ALJ accords less than controlling weight to a treating source's opinion, the ALJ must "give good reasons" for doing so. *Gayheart*, 710 F.3d at 376. Such reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." This requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.* (quoting *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544 (6th Cir. 2004)). Simply stating that the physician's opinions "are not well-supported by any objective findings and are inconsistent with other credible evidence" is, without more, too "ambiguous" to permit meaningful review of the ALJ's assessment. *Gayheart*, 710 F.3d at 376-77.

If the ALJ affords less than controlling weight to a treating physician's opinion, the ALJ must still determine the weight to be afforded such. *Id.* at 376. In doing so, the ALJ must consider the following factors: (1) length of the treatment relationship and frequency of the examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion, (4) consistency of the opinion with the record as a whole, (5) the specialization of the treating source, and (6) other relevant factors. *Id.* (citing 20 C.F.R. § 404.1527). While the ALJ is not required to explicitly discuss each of these factors, the record must nevertheless reflect that the ALJ considered those factors relevant to his assessment. *See, e.g., Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007); *Undheim v. Barnhart*, 214 Fed. Appx. 448, 450 (5th Cir., Jan. 19, 2007).

In discounting Dr. Millermaier's opinion, the ALJ offered several rationales.  The ALJ first observed that "no other physician has stated that the claimant is unable to work."  (Tr. 694).  The ALJ next discounted the doctor's opinion because it "was on a small prescription pad."  (Tr. 694).  The ALJ also noted that the doctor "gave no supporting findings to prove why she can work only part time."  (Tr. 694).  Finally, the ALJ observed that Dr. Millermaier "has left the state and is no longer a treating source."  (Tr. 695).

Whether Dr. Millermaier has since moved and is no longer treating Plaintiff is not relevant.  As for the ALJ's conclusion that "no other physician has stated that the claimant is unable to work," the Court notes that the ALJ failed to identify any opinion from any of Plaintiff's treating physicians which is inconsistent with Dr. Millermaier's opinion.  Finally, while the ALJ is correct that the opinion itself, because it was written on a "small prescription pad," was not accompanied by any particular findings or analysis, considering the voluminous record in this matter, all of which supports the doctor's opinion, the Court finds this rationale unpersuasive.  In sum, the ALJ's rationale for discounting Dr. Millermaier's opinion is not supported by substantial evidence.

IV.        **Remand for Payment of Benefits is Appropriate**

As discussed herein, the ALJ's decision suffers from several shortcomings.  The ALJ did not properly assess Plaintiff's credibility.  This error is not harmless given that Plaintiff's testimony and subjective allegations are utterly inconsistent with the ALJ's decision.  The ALJ improperly rejected Dr. Millermaier's opinion.  This shortcoming is likewise not harmless as the doctor's opinion is inconsistent with the ALJ's RFC determination which serves as the basis for the vocational expert's testimony that there exists a significant number of jobs that Plaintiff can perform

despite her impairments and limitations.  Finally, the ALJ's decision that Plaintiff does not satisfy the requirements of Listing 6.02 is not supported by substantial evidence.

While the Court finds that the ALJ's decision fails to comply with the relevant legal standards, Plaintiff can be awarded benefits only if proof of her disability is "compelling."  *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994) (the court can reverse the Commissioner's decision and award benefits if all essential factual issues have been resolved and proof of disability is compelling).  The Court finds that this matter must be remanded for the payment of benefits for two reasons.  First, Plaintiff has satisfied her burden that she suffers from a listed impairment entitling her to disability benefits.  In the alternative, the Court finds that the evidence of record compellingly supports the conclusion that Plaintiff is disabled and likewise entitled to benefits.

## <u>CONCLUSION</u>

For the reasons articulated herein, the undersigned concludes that the ALJ's decision is not supported by substantial evidence.  Accordingly, it is recommended that the Commissioner's decision be **reversed and this matter remanded for payment of benefits**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within fourteen (14) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C). Failure to file objections within such time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  September 23, 2014                          /s/ Ellen S. Carmody
                                                                      ELLEN S. CARMODY
                                                                      United States Magistrate Judge